UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAFER REDI MIX, INC.,

    Plaintiff,

v.

File No. 1:08-CV-652

HON. ROBERT HOLMES BELL

TEAMSTERS LOCAL 7,

    Defendant.
                                /

**O P I N I O N**

This action alleging a violation of § 303 of the National Labor Relations Act, 29 U.S.C. § 187, is before the Court on Defendant's motion for summary judgment. (Dkt. No. 34.) For the reasons that follow the motion will be granted.

**I.**

Clark Construction, Inc. ("Clark") was the General Contractor or Construction Manager for the construction of the Firekeepers Casino Project in Battle Creek, Michigan ("Casino Project") for the Nottawaseppi Huron Band of Potawatomi Indians. The Casino Project was covered by a Project Labor Agreement ("PLA") which contained a no-picketing provision. Clark subcontracted a portion of the Casino Project to Grand River Construction, Inc. ("Grand River").

1

In February of 2008, Grand River received ready mix bids from two contractors, Plaintiff Shafer Redi Mix ("Shafer") and Consumers Concrete. Grand River selected Shafer as the ready mix concrete supplier for the Casino Project. (Foster Dep. 33.) Shafer is a non-union company. Shafer attended a pre-project conference at a union hall in Three Rivers, Michigan on May 18, 2008. At the meeting a representative of Teamsters Local 7 ("Local 7") expressed displeasure that Shafer had been chosen and said he would rather have Consumers Concrete on the job. (Shafer Dep. 32-33.)

On May 21, 2008, Duane Wixson, project manager of the Casino Project for Clark, received a telephone call from three union representatives, including Tom Harty of Local 7. (Wixson Decl. ¶ 6; Harty Dep. 25.) The union representatives asked why Shafer had been awarded the bid and described previous problems they had experienced with Shafer. (Wixson Dep. 10; Harty Dep. 28.) There is also evidence that during that telephone call, one of the union representatives indicated that if Shafer was on the Casino Project there could be a labor disruption on the Project site because a Jackson local bargaining unit could picket the Project. (Wixson Dep. 10; Wixson Decl. ¶ 12.)

Consumers subsequently submitted a revised bid that matched the price of Shafer's bid. Approximately one week before Shafer was scheduled to begin pouring, Grand River terminated its contract with Shafer and selected Consumers Concrete to be the ready mix supplier on the Casino Project.

Shafer filed this action against Local 7, alleging that Local 7 violated § 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §158(b)(4), by threatening picketing and work stoppages if Shafer was not replaced. Defendant has filed a motion for summary judgment.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendants carry their burden of showing there is an absence of evidence to support a claim then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such

that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## III.

Shafer alleges in this action that Local 7 threatened Clark with picketing and work stoppages if Shafer was not replaced, and that as a result of this threat, Shafer was replaced as the ready mix supplier. (Compl. ¶ 12.)

Section 303 of the LMRA provides a cause of action for damages against a labor organization for an unfair labor practice as defined in § 158(b)(4). 29 U.S.C. § 187. Section 158(b)(4) provides in pertinent part that it is an unfair labor practice for a labor organization "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce," with the object of "forcing or requiring any person . . . to cease doing business with any other person . . . ." 29 U.S.C. § 158(b)(4)(ii)(B).

Defendant Local 7 moves for summary judgment based upon its contention that Plaintiff Shafer cannot demonstrate that Local 7 engaged in an illegal secondary threat under § 8(b)(4), nor can it demonstrate that any illegal secondary threat by Local 7 was the proximate cause of any damages to Shafer.

### A. Illegal Threat to Picket

The first question raised in Local 7's motion for summary judgment is whether there was a threat to picket in violation of § 303 of the LMRA.

"Congress passed § 8(b)(4)(ii)(B) to prevent a union involved in a dispute with a primary employer from forcing a neutral secondary employer to enter the fray on the union's side to preserve its own business." *Kroger Co. v. NLRB*, 647 F.2d 634, 637 (6th Cir. 1980) (citing *NLRB v. Fruit & Vegetable Packers Local 760*, 377 U.S. 58 (1964)). "[G]eneral predictions of problems or trouble are not alone sufficient to establish threats or coercion within the meaning of section 8(b)(4)(ii)." *Brown & Root, Inc. v. La. State AFL-CIO*, 10 F.3d 316, 322 (5th Cir.1994). "[T]he mere reference to problems by the Unions may alone be found insufficient to constitute coercion, and the case law establishes that the trier of fact must find such general amorphous statements coercive only when accompanied by actual or threatened picketing or walking off the job or the like or preparations for same." *Id.* In determining whether a union's actions constitute coercion, the union's " entire course of conduct" should be examined. *Wells v. NLRB*, 361 F.2d 737, 742-743 (6th Cir.1966).

The record in this case includes evidence that on May 21, 2008, union representatives called Wixson, the project superintendent at Clark, and made the following representations:

> 12. The union representatives then indicated that if Shafer was on the project there could be a labor disruption on the project site, specifically, that a Jackson local bargaining unit could picket the project. I specifically recall them using "picket".
>
> 13. The union representatives also stated that they could not control the Jackson local bargaining unit. I understood this to be a warning of possible pickets or other worksite disruptions in the event that Shafer was the concrete supplier on the project.

(Dkt. No. 36, Eisenberg Aff., Ex. 3, Wixson Decl. ¶¶ 12,13.)

5

Local 7 contends that Wixson's testimony, if credited, is nothing more than a claim of union problems if Shafer, a non-union supplier, was used on a project covered by a project labor agreement. Local 7 contends that it had the right to tell Clark that it wanted a union contractor on the job, and that there is no evidence that the conversation was accompanied by coercive threats to obtain such an objective.

Contrary to Local 7's assertions, Wixson's declaration includes evidence of more than general predictions of problems or trouble. It includes a specific suggestion that there might be picketing. Whether or not the suggestion of possible picketing was sufficiently coercive to constitute a violation of § 8(b)(4)(ii) is a question of fact for trial. *See Ozark v. Local 978 Carpenters*, 957 F.2d 566, 568-69 (8th Cir. 1992) (reversing summary judgment for the union because the union's statement that "You're going to do it union because if you don't, we will probably have to . . . . go picketing," viewed in the light most favorable to the non-moving party, would enable a reasonable jury to find an unlawful threat).

## 2. Evidence Connecting Local 7 to the Threat

Local 7 contends that even if there is sufficient evidence that someone threatened a job action against either Clark or Grand River for choosing Shafer as its ready mix supplier, Shafer cannot prove that it was a representative of Local 7 who made the threat.

The participants in the May 21, 2008, telephone call to Wixson were Tom Harty, the president of Local 7, Alan Sprague, a representative of Teamsters Local 164, and Hugh Coward, a representative of the Southwest Michigan Building Trades Council. (Harty Dep.

6

25.) Each of the union representatives has denied making or hearing any comment about picketing. (Harty Dep. 30; Sprague Dep. 19; Coward Dep. 34-35.) Wixson has testified that someone made a comment about picketing, but he does not recall who made the statement. (Wixson Decl. ¶ 8.)

Local 7 contends that it cannot be held liable for violating § 8(b)(4)(ii) because no witness can identify which of the three union representatives actually vocalized the alleged threat. Moreover, Local 7 points out that the Project Labor Agreement contains a no-picketing provision. Wixson's recollection is that there was reference to possible picketing by Teamsters Local 164 (the Jackson Local), which was not a signatory to the PLA. (Wixson Dep. 13-14.) The evidence is also undisputed that Harty specifically reassured Wixson that Local 7 would live up to its obligations under the Project Labor Agreement. (Harty Dep. 29; Sprague Dep. 15.)

Although Shafer acknowledges that it does not have any direct evidence that Harty made the alleged threat to picket, Shafer contends that Local 7 can nevertheless be held responsible for the threat of potential picketing by Local 164 under a joint venture or agency theory.

Local 7 contends that joint venture and agency principles should not be applied to hold one union liable for the actions of another union. *See NLRB v. Sheet Metal Workers' Int'l Assoc., Local Union No. 19*, 154 F.3d 137, 143 (3d Cir. 1998) ("We hold that the joint venture theory of agency adopted by the A.L.J. and the Board below is inconsistent with § 8

7

of the Act."); *Int'l Longshoremen's Ass'n, AFL-CIO v. NLRB*, 56 F.3d 205, 215 (D.C. Cir. 1995) (rejecting the theory that one union may become the agent of a second completely independent union merely by responding to a request for assistance in a labor dispute).

Although the weight of authority appears to be with Local 7, there is some case law to support a finding of a joint venture where agents of several unions participate in a common design to pressure a single employer. *See Dowd v. Int'l Longshoremen's Ass'n, AFL-CIO*, 975 F.2d 779, 785 (11th Cir. 1992) ("Under the liberal application of agency concepts appropriate in the labor context, a contractual right to control and direct the performance of another is not required to impose responsibility under section 8(b) where an employer or union has encouraged or requested another to engage in unfair labor practices on its behalf.").

Shafer has introduced evidence that Harty, the president of Local 7, gathered the other union representatives at the Local 7 office and initiated the telephone call to Wixson. In addition, Wixson has testified that although he does not recall which union representative made what statement during the call, each of the three union representatives were in agreement with each other. (Wixson Decl. ¶ 8.) Shafer infers that Harty included Local 164 in the telephone call so that there could be a threat of picketing by the union that had not signed the PLA.

Shafer's evidence for holding Local 7 responsible for the potential actions of Local 164, is slim, at best. Nevertheless, for purposes of this motion, the Court will assume that there is a question of fact as to whether Local 7 can be held liable for the alleged picketing statement.

### 3. Proximate Cause

Finally, Local 7 contends that even if there is a question of fact as to whether it made an illegal threat, there is no evidence that the illegal threat was the proximate cause of Shafer's removal from the Casino Project. The Court agrees.

Shafer bears the burden of establishing "with reasonable probability the existence of some causal connection between Defendant's wrongful act and some loss of anticipated revenue." *Mead v. Retail Clerks Int'l Assoc.*, 523 F.2d 1371, 1377 (9th Cir. 1975). It is Shafer's position in this case that the picketing threat allegedly made during the May 21, 2008, telephone call caused Shafer to be removed from the Project. Local 7 contends that Shafer cannot prove that an unlawful threat caused it to lose the Casino Project because Clark's opposition to Shafer predated the May telephone conversation, and because the decision to reassign the contract to Consumers was made without reference to the May 21, 2008, telephone conversation.

Shafer contends that there is an issue of fact as to causation based upon the sequence of events: (1) although Wixson was aware in February that Grand River had chosen Sahfer, he took no action to remove Shafer; (2) from February through May, Shafer and Grand River proceeded under the assumption that Shafer would be the ready mix supplier; (3) when Wixson learned that Shafer had signed the Project Labor Agreement, he told Shafer that they were all set; (4) on May 21, 2008, the union representatives called Wixson and threatened to picket the project; and

> 5. After the May 21st threat, Mr. Wixson pressures Grand River to replace Shafer and sends the May 29, 2008 letter stating its preference to have a union contractor supply the redi mix. Based on the letter, Grand River replaces Shafer.

(Dkt. No. 47, Pl.'s Br. 25.)

Shafer's fifth assertion assumes that Wixson pressured Grand River to replace Shafer after the May 21 threat, and that Grand River only decided to replace Shafer after it received this communication from Wixson after the May 21 threat. These assumptions are not supported by the record.

The evidence is undisputed that within a week of turning in their bid to Clark, Grand River began hearing that there would be issues with using Shafer. (Foster Dep. 49-52; Kersaan Dep. 16-17.)

> He told me that they were getting pressure from outside people, primarily the union trade people. Shafer was not a union company and he wanted us to do something about it.

(Foster Dep. 50.) Prior to the prejob meeting on May 13, 2008, Wixson again told Kersaan that Clark had concerns about Grand River bringing Shafer to the prejob because the union was not happy with using Shafer. (Foster Dep. 56.) Wixson continued to express his concerns about using Shafer several times, both during meetings and during telephone calls. (Foster Dep. 50-51.) From conversations over a period of time, Grand River understood that Clark wanted them to change suppliers. (Kersaan Dep. 12.)

The decision on which concrete supplier to use was made after input from four partners at Grand River. (Kersaan Dep. 13-14.) Foster recommended staying with Shafer,

10

but Kersaan recommended that they should switch to Consumers if that was what Clark wanted. (Kersaan Dep. 13.) Kersaan's view prevailed. (Kersaan Dep. 13-14.) However, Kersaan told Foster that before letting Shafer go, he should get a letter from Clark stating that Clark wanted them to change suppliers. (Kersaan Dep. 11-12.)

On May 21, shortly after the telephone conversation between Wixson and the union representatives, Harty of Local 7 called Foster at Grand River to find out why Consumers had not been selected as the ready mix supplier. (Harty Dep. 30.) Foster explained that Consumers's bid was higher than Shafer's. (Foster Dep. 95; Harty Dep. 31.) Harty then called Tom Thomas of Consumers and told him that pricing was the issue, and that he should call Grand River to discuss the pricing. (Harty Dep. 31-32.) Later that same day Thomas called Foster and asked what he need to do to get the job. (Foster Dep. 96.) Foster told him he would have to lower his bid, and Clark would have to get rid of Shafer. (Foster Dep. 97.) Thomas called Foster a second time the same day. When Thomas told Foster he would be able to lower his price, Foster told him to submit mix designs and get prepared for the project and requote. (Foster Dep. 98-99.) Foster explained what he meant by having Thomas submit mix designs:

> That means basically plan on the project, that we need concrete. It's a very large project and he needed to start preparing his team if you will, his organization, that he would more than likely end up with the project if his numbers came in and we had Clark instruct us to remove Shafer. We were waiting for the letter from Clark to remove Shafer.

(Foster Dep. 99.)

11

On the following day, May 22, 2008, Consumers submitted its mix design. Consumers' mix design was approved on May 23, 2008. (Foster Dep. Ex. 9.) Shafer had submitted mix designs in February and in April, but as of the end of May Grand River still had not received Clark's approval of the mix designs. (Foster Dep. 60.)

On May 29, 2008, in response to Grand River's request, Wixson sent a letter which provided in pertinent part:

> It is Clark Construction Company's desire to promote labor harmony on the Firekeepers Casino Project. For this reason, it is preferred that the concrete supplier be unionized. However, no additional cost will be authorized beyond the original contract value.

(Foster Dep. Ex. 11.) Approximately one week before the concrete was scheduled to be poured, Foster called Shafer to advise that Shafer's mix designs had not been approved and that he had been forced by Clark to switch suppliers to Consumers, a union company. (Foster Dep. 72; Shafer Dep. 36-37.)

On first blush, the timing between the May 21 telephone call from the union representatives to Wixson, and the decision to reassign the ready mix supply contract to Consumers appears to be somewhat suspect. However, upon closer review, the Court finds that there is no evidence to support Shafer's contention that the decision to switch suppliers was made as a result of the May 21 discussion between Wixson and the union representatives. There is no evidence that Wixson had any contact with anyone at Grand River between the time of his telephone conference with the union representatives and later in the day when Grand River told Consumers to submit its mix designs. In fact, based upon

Foster's testimony quoted above, it appears that Grand River had already requested the letter from Clark sometime before it essentially promised the job to Consumers.  The fact that Clark did not supply the letter until May 29 does not suggest that the letter was prompted by the union representatives' telephone call or that the letter caused Grand River to switch suppliers. Grand River had already made up its mind to switch to Consumers if the numbers came in and if Clark supplied the letter expressing their desire that Grand River remove Shafer.  The unrefuted evidence establishes that the decision to switch ready mix suppliers was based on Clark's continuous hostility to using a non-union supplier, on Grand River's desire to do what Clark wanted, and on Consumers's decision to lower its bid.  Shafer has simply failed to produce any evidence from which a trier of fact could reasonably infer that any unlawful secondary threat made by Local 7 was the proximate cause of Shafer's removal from the Casino Project.  Accordingly, Local 7's motion for summary judgment will be granted and judgment will be entered in favor of Local 7.

An order and a judgment consistent with this opinion will be entered.


Dated: September 10, 2009               /s/ Robert Holmes Bell
                                        ROBERT HOLMES BELL
                                        UNITED STATES DISTRICT JUDGE